Opinion issued November 17, 2016



In The

# Court of Appeals

For The

# First District of Texas

———————————

NO. 01-16-00088-CR

———————————

**BRUCE EDWARD GORDEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case No. 1473697**

---

## MEMORANDUM OPINION

A jury found appellant, Bruce Edward Gorden, guilty of the offense of aggravated assault with a deadly weapon.[1] After he pleaded true to the allegations

---

[1]     *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (Vernon 2011).

in two enhancement paragraphs that he had twice been previously convicted of felony offenses, the trial court assessed his punishment at confinement for thirty-two years. In two issues, appellant contends that the evidence is insufficient to support his conviction and the trial court erred in denying his motion to suppress an impermissibly suggestive photographic array.

We affirm.

## Background

Roy Nelams, the complainant, testified that at about 8:30 p.m. on May 30, 2015, he attended a party at a friend's house with twelve or thirteen other guests, including appellant. The complainant had known appellant by his first name for about eight years because they were from the same neighborhood.

At about 11:30 p.m., appellant asked the complainant, who was sitting at a table in the garage, to come outside with him. In response, the complainant shook his head and turned away. However, when appellant again asked the complainant to come outside with him, the complainant complied. Appellant then accused the complainant of trying to talk to appellant's wife. Appellant stated that he had heard that the complainant was the type of person who "mess[ed] with [other] people's women." When the complainant attempted to walk away, appellant, with his fist, hit the complainant on the jaw, rendering the complainant "unconscious for a

minute." Once the complainant regained consciousness and his "eyes focused," he saw appellant standing in the street next to his car with three or four other people.

The complainant then ran to appellant and hit him on his face and chest. The two men "tussled" and hit each other. As the complainant punched appellant, who had been standing up and against his car, appellant began "sliding down" the side of the car. The complainant then noticed that appellant, with his right hand, was "grabb[ing] for a gun." When he saw the gun in appellant's hand, it fired.

The complainant further testified that at this point, others grabbed him and told him to stop because he had been shot. Although the complainant did not initially realize that he had been shot, he knew that he had been once he backed away, lifted his shirt, and smelled his flesh, which had started to burn.[2] When the complainant saw that appellant had entered his car, he reached in to hit him. The complainant then fell to the ground. He did not remember seeing appellant drive away as he had "probably passed out [by] then." The complainant explained that appellant had shot him once on his left side and the bullet is still in his body.

The complainant noted that after the shooting, he spoke with Houston Police Department ("HPD") Officer J. Robles and provided him with appellant's first name,

---

[2]    The trial court admitted into evidence a photograph showing the location of the "bullet wound" on the complainant's body. And hospital records admitted into evidence indicate that the complainant arrived at the hospital with a "[g]un [s]hot [w]ound" to his "left axilla."

his address, his license plate number, and the make and model of his car. Robles later showed the complainant a photographic array, admitted into evidence as State's Exhibit 11, which contained six photographs. The complainant, from the photographic array, identified appellant as the person who had shot him. He explained that there was "[n]o question" in his mind that his identification was correct.

Beverly Scott Emerson testified that the shooting occurred on May 30, 2015 at her house during a "birthday barbecue for [her] god sister." She held the party, which started at 8:00 p.m. and consisted of about ten or twelve people, in her "back garage." Emerson noted that at one point during the evening, she saw appellant and the complainant talking. She then saw the complainant on the ground in front of the garage.

Immediately thereafter, Emerson, while standing in the front yard of her house, saw appellant and his wife walking to their car in order to leave the party. After they entered their car and began to drive away, the complainant, who had run past Emerson, "came up" to the car and "punched inside" at appellant.

As Emerson explained, after the complainant had "punched inside" the car, it stopped and she heard a "pow, pow." (Internal quotations omitted.) She then saw the complainant on the ground. As appellant drove away, the complainant remained on the ground in the middle of the street. Emerson noted that when she had heard

4

what "sounded like gunfire," there were "[n]o other vehicles . . . driving off" from the house and "[e]verybody else was still in the back yard." She did not see a gun near the complainant, although he had been shot. And she did not know from which direction the gunfire had come.

HPD Officer R. Vela testified that on May 30, 2015, he was dispatched to a shooting. When he arrived, an Emergency Medical Service ("EMS") technician indicated to Vela that the complainant was being treated for a gunshot wound. Vela further explained that in the middle of the street, where the shooting had occurred, he saw a "fresh" bloodstain. He recovered a nearby shell casing, which appeared to have been "freshly fired." And he, noting that he did not recover a firearm from the scene, opined that the shell casing had been fired from a "9-millimeter gun." Vela also opined that a firearm constitutes a weapon capable of causing death or "a risk to some[one]'s life" and the complainant had suffered bodily injury.

Officer Robles testified that while investigating the shooting, he spoke to the complainant, who identified appellant, by name, as the person who had shot him.[3] The complainant also told Robles that appellant had hit him, causing him to "pass[] out or black[] out." And after the complainant "got up and . . . ran after" appellant, the two men started fighting. At some point, during the fight, "a gun was produced,"

---

[3] The complainant also provided Officer Robles with the appellant's address, his license plate number, his place of employment, and the make and model of his car.

5

and appellant pointed the gun at the complainant, shooting him "once in the side." Appellant then fled the scene in his car.

After speaking with the complainant, Officer Robles prepared a photographic array, State's Exhibit 11, which consists of photographs of appellant and five other bald, African-American males dressed in civilian clothing. The men are "generally [of] the same size and build," with "general facial similarities." When Robles presented the array to the complainant, he immediately identified appellant as the man who had shot him.

Robles noted that the photograph of appellant in the array shows him with a "very visible mustache," while the male in the photograph next to appellant does not have a "very clear" mustache. Robles also noted that another male pictured in the array does not have a mustache and two other males have only "slight mustaches." However, when the complainant, prior to viewing the photographic array, named appellant as the person who had shot him, he made no reference to the fact that appellant had a mustache.[4]

_____

[4] At the hearing on appellant's motion to suppress the photographic array, Officer Robles similarly testified that the array contains six photographs of males, including appellant, with "similar facial characteristics" and wearing civilian clothing. Robles noted that appellant, in his photograph, has a "visible" but "small mustache." However, two other males appear to have "faded" mustaches. Two additional males are "clean cut." And the last male in the array has a mustache. Robles further noted that appellant's photograph has "a gloss," although another photograph has "a bigger gloss." And he explained that the complainant never described appellant as "having a mustache at the time of the shooting."

6

Appellant testified that at about 8:00 p.m. on May 30, 2015, he attended a friend's party with his wife and they left after he and the complainant got into a fight. He explained that he knew the complainant by his first name because they had lived in the same neighborhood. And he noted that he and the complainant talked two or three times that evening about "general stuff," i.e., "[d]ancing, who was dancing, who was doing this and who was doing that."

At some point, appellant and the complainant, while standing in front of the garage, had a "verbal altercation" because the complainant had said "something about" appellant's cousin. The complainant "started cussing," appellant "started cussing," and then they began fighting. After the complainant "threw the first punch," hitting appellant in the neck, appellant "swung back," hitting the complainant in the jaw and causing him to fall down. Appellant and his wife then walked to his car, which was parked in the street, in order to leave the party because appellant "didn't want [any] trouble."

After appellant entered the car, backed it out, and started to drive away, the complainant came "running up," "swing[ing]" inside the car and hitting appellant twice in the face. Appellant then "hit" the car's gas pedal and drove off. As he did so, he heard one gunshot, which came from behind his car. At the time, he thought that the complainant possibly had a firearm and may have been shooting at him. Finally, appellant stated that he did not "pull a gun on" the complainant, he does not

own a firearm, and he did not shoot the complainant. Although appellant conceded that the complainant had been shot that evening, he stated that he did not know the location of the shooter.

## Sufficiency of the Evidence

In his first issue, appellant argues that the evidence is insufficient to support his conviction because "the evidence that [he] was the shooter is purely circumstantial," "no one actually saw [him] shoot [the complainant]," and neither "the complaining witness, an accomplice, [n]or an independent third-party identified [him as] being the shooter."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually

8

supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.* This Court now reviews the factual sufficiency of the evidence under the same appellate standard of review as that for legal sufficiency. *Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

A person commits an assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp. 2016). A person commits the offense of aggravated assault if he "commits assault as defined in [section] 22.01 and [he] . . . uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2) (Vernon 2011). A firearm is a deadly weapon. *Id.* § 1.07(a)(17)(A) (Vernon Supp. 2016); *see also Jones v. State*, No. 01-15-00358-CR, --- S.W.3d ---, 2016 WL 3964911, at *5 (Tex. App.—Houston [1st Dist.] July 21, 2016, no pet.). "Bodily injury means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (internal quotations omitted).

The complainant testified that on May 30, 2015, he and appellant, whom he knew, attended a party. After appellant hit the complainant with his fist, rendering the complainant "unconscious for a minute," the complainant awoke and saw appellant standing in the street next to his car. He ran to appellant and hit him on his face and chest. The two men "tussled" and hit each other. The complainant then noticed appellant, with his right hand, "grabb[ing] for a gun." When he saw

9

appellant with the gun in his hand, it fired. Although the complainant did not initially realize that he had been shot, he knew that he had been once he backed away, lifted his shirt, and smelled his flesh, which had started to burn. The complainant explained that appellant shot him once on his left side and the bullet is still in his body.

When the complainant spoke with Officer Robles, he identified appellant as the person who had shot him. And he later identified appellant as the shooter in the photographic array, State's Exhibit 11, that Robles presented to him. In the complainant's mind, there was "[n]o question" that his identification of appellant as the person who had shot him was correct.

Emerson testified that during the party, she saw appellant and the complainant talking. She then saw the complainant on the ground in front of the garage. Immediately thereafter, Emerson saw appellant and his wife walking to their car to leave the party. After they entered their car and began to drive away, the complainant, who had run past Emerson, "came up" to the car and "punched inside" at appellant. The car then stopped, and Emerson heard a "pow, pow." (Internal quotations omitted.) She saw the complainant on the ground and appellant driving away. Emerson noted that when she heard what "sounded like gunfire," there were "no other vehicles . . . driving off" from the house and "[e]verybody else was still in the back yard." She did not see a gun near the complainant, who had been shot.

Officer Vela testified that he observed, in the middle of the street, where the shooting had occurred, a "fresh" bloodstain, and he recovered a nearby shell casing, which appeared to have been "freshly fired." Vela opined that the shell casing had been fired by a "9-millimeter gun," but noted that he did not recover a firearm at the scene.

Finally, Officer Robles testified that when he spoke to the complainant after the shooting, the complainant identified appellant, by name, as the person who had shot him. The complainant also told Robles that appellant had hit him, causing him to "pass[] out or black[] out." After the complainant "got up and . . . ran after" appellant, the two men started fighting. At some point, during the fight, "a gun was produced." Appellant pointed the gun at the complainant and shot him "once in the side." Appellant then fled the scene in his car. Robles noted that when he presented the complainant with a photographic array, State's Exhibit 11, the complainant immediately identified appellant as the person who had shot him.

The evidence outlined above contradicts appellant's assertions that "no one actually saw [him] shoot [the complainant]" and neither "the complaining witness, an accomplice, [n]or an independent third-party identified [him as] being the shooter." Here, the complainant testified that he saw appellant with a gun in his right hand, the gun was fired, and he was shot. And the complainant, both when speaking with Officer Robles and testifying at trial, specifically identified appellant

11

as the person who had shot him. A "positive identification of a defendant as the perpetrator is sufficient to support a conviction." *Gilmore v. State*, 397 S.W.3d 226, 240 (Tex. App.—Fort Worth 2012, pet. ref'd) (complainant unequivocally identified defendant as shooter and "jury could have reasonably concluded beyond a reasonable doubt that [defendant] was the man in the park who shot [complainant] based on th[is] identification testimony alone"); *see also Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978) (complainant's identification of defendant "as the man who raped her" sufficient); *Padilla v. State*, 254 S.W.3d 585, 590 (Tex. App.—Eastland 2008, pet. ref'd) ("[T]he victim's testimony alone is sufficient to support a guilty verdict."); *Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("It is well established that a conviction may be based on the testimony of a single eyewitness."). It is not necessary for an accomplice or a third-party to witness a defendant committing the offense of aggravated assault. *See, e.g.*, *Mays v. State*, No. 01-13-00805-CR, 2015 WL 6081409, at *3 (Tex. App.—Houston [1st Dist.] Oct. 13, 2015, no pet.) (mem. op., not designated for publication).

Further, we note that although appellant testified the he did not "pull a gun on" the complainant and did not shoot the complainant, the jury, as the exclusive judge of the facts, credibility of the witnesses, and weight to be given to their testimony, was free to believe or disbelieve all or any part of appellant's testimony.

*See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005); *McKinny v. State*, 76 S.W.3d 463, 468–69 (Tex. App.—Houston [1st Dist.] 2002, no pet.). And we assume that the jury resolved any conflicts in favor of the verdict. *Matchett v. State*, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996).

Finally, to the extent that appellant complains that the evidence is "purely circumstantial," a court, in reviewing the sufficiency of the evidence, must consider both direct *and* circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and a conviction may be supported by circumstantial evidence standing alone. *See Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found the essential elements of the offense of aggravated assault beyond a reasonable doubt. Accordingly, we hold that the evidence is sufficient to support appellant's conviction.

We overrule appellant's first issue.

## Photographic Array

In his second issue, appellant argues that the trial court erred in denying his motion to suppress the photographic array, State's Exhibit 11, because it was impermissibly suggestive.

We review de novo a trial court's ruling on the suggestiveness of a pre-trial photographic array. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009); *Cienfuegos v. State*, 113 S.W.3d 481, 491 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). First, we determine whether the pretrial identification procedure was impermissibly suggestive. *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Second, if we conclude that the procedure was impermissibly suggestive, we then determine whether the impermissibly suggestive nature of the pretrial lineup gave rise to a substantial likelihood of irreparable misidentification. *Gamboa*, 296 S.W.3d at 581–82; *Adams*, 397 S.W.3d at 764. If the pretrial procedure is found to be impermissibly suggestive, identification testimony would nevertheless be admissible where the totality of the circumstances shows no substantial likelihood of misidentification. *Adams*, 397 S.W.3d at 764. A defendant bears the burden of showing by clear and convincing evidence both impermissible suggestion and a substantial likelihood of misidentification. *See Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim. App. 1995); *see also Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

Appellant argues that State's Exhibit 11 is impermissibly suggestive because it contains photographs of three males that do not appear to have mustaches, photographs of two males with only "slight mustaches," and a photograph of appellant with a "very heavy mustache." Further, the photographs of the males with only "slight mustaches" are "considerably darker" than the photograph of appellant, which is "much lighter," due to the gloss on his photograph.

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that the use of that identification at trial would deny a defendant due process. *Barley*, 906 S.W.2d at 32–33. A pretrial identification procedure may be impermissibly suggestive based on the manner in which it was conducted or the content of the photographic array. *Id.* at 33. To amount to the level of suggestiveness made impermissible, the photographic identification procedure must in some way be so defective as to indicate or suggest the photograph that the witness is to identify. *Ward v. State*, 474 S.W.2d 471, 475 (Tex. Crim. App. 1971).

While every photographic array must contain photographs of individuals who fit the rough description of the suspect, it is not essential that all individuals be identical in appearance. *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985); *Colgin v. State*, 132 S.W.3d 526, 532 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). Neither due process nor common sense requires that the individuals in a photographic array exhibit features exactly matching the accused. *Buxton*, 699

15

S.W.2d at 216; *Colgin*, 132 S.W.3d at 532.  Nor are such practices practical. *Ward*, 474 S.W.2d at 475–76; *see also Broussard v. State*, No. 01-15-00628-CR, 2016 WL 887781, at *4 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, pet. ref'd) (mem. op., not designated for publication) ("Some differences in the appearance of individuals are inevitable . . . .").

As we have previously stated, "a photographic array is not impermissibly suggestive merely because each photograph can be distinguished in some manner from the photograph of the accused." *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).  A photographic array is not considered impermissibly suggestive unless the defendant is placed with "persons of *distinctly* different appearance, race, hair color, height or age." *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd).

Here, all of the males pictured in the photographic array are of the same race and of similar age and size.  Officer Robles explained that when he prepared the photographic array, he selected, in addition to appellant, five other bald, African-American males in civilian clothing, who are "generally [of] the same size and build" with "general facial similarities." *See Page*, 125 S.W.3d at 647 (photographic array not impermissibly suggestive where "[a]ll of the men pictured in the array [were] African-American, [were] wearing civilian clothes, ha[d] short black hair, and appear[ed] to be similar in age").

16

In regard to facial hair, Robles noted that appellant, in his photograph, does have a "very visible mustache." The male pictured in the photograph next to appellant does not have a "very clear" mustache. Another male pictured in the array does not have a mustache. And two other males have only "slight mustaches."[5] The fact that appellant is the only male in the photographic array with a "very visible mustache" does not rise to the level of prohibited suggestiveness. *See Turner v. State*, 600 S.W.2d 927, 932–33 (Tex. Crim. App. [Panel Op.] 1980) (only two other individuals in five person lineup had beards); *Anderson v. State*, 414 S.W.3d 251, 259 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (photographic array not impermissibly suggestive where only two males, other than defendant, had facial hair); *Withers*, 902 S.W.2d at 125 (photographic array not impermissibly suggestive where two males "wore beards" and defendant "clean shaven"). Further, there is no evidence that the complainant identified appellant as the shooter based on the fact that he had a mustache.

In regard to the purported "gloss[iness]" of appellant's photograph in the array, Officer Robles testified that although appellant's photograph has "a gloss," the photograph of another male in the array has "a bigger gloss." The background

---

[5] At the hearing on appellant's motion to suppress the photographic array, Officer Robles stated that appellant, in his photograph, has a "visible" "small mustache." Two other males pictured in the photographic array appear to have "faded" mustaches, and two other males are "clean cut."

of appellant's photograph does not appear to be different from the background of the other photographs. And the lighting in appellant's photograph does not appear to be eye-catching. Thus, any slight differences in the background color or the brightness of appellant's photograph are insignificant. *Page*, 125 S.W.3d at 647 (photographic array not impermissibly suggestive, although background and texture of defendant's photograph "different than the background and texture of some of the other photographs in the array" (internal quotations omitted)); *see also Barley*, 906 S.W.2d at 33–34 (photographic array not impermissibly suggestive, although "two of the photos appear[ed] to be older and faded and one [was] obviously taken in a different setting"); *Perez v. State*, No. 01-09-00805-CR, 2010 WL 4056540, at *3 (Tex. App.—Houston [1st Dist.] Oct. 14, 2010, no pet.) (mem. op., not designated for publication) ("[E]ven if the [defendant's] photograph had a darker or lighter tint than the other photographs in the array, that would not render the photo array impermissibly suggestive."); *Mungia v. State*, 911 S.W.2d 164, 168 (Tex. App.—Corpus Christi 1995, no pet.) (although defendant's photograph "marginally lighter than the others, [it was] not so different from the remainder as to be suggestive").

We conclude that appellant has not met his burden of showing that the pretrial identification procedure was impermissibly suggestive. Accordingly, we hold that the trial court did not err in denying appellant's motion to suppress and admitting the photographic array, State's Exhibit 11, into evidence. *See Colgin*, 132 S.W.3d

at 532 ("Because we conclude that the pretrial identification procedures were not impermissibly suggestive, we need not address whether those procedures created a substantial likelihood of misidentification.").

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Keyes, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).